IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GLADYS HILL, et al., | * | |
| | * | |
| v. | * | Civil No. CCB-12-539 |
| | * | |
| HAMPSTEAD LESTER MORTON | * | |
| COURT PARTNERS, LP, et al. | * | |
| | * | |

******

## MEMORANDUM

Plaintiffs Gladys Hill and Cynthia Mitchell seek relief from defendants Hampstead Lester Morton Court Partners, LP; Hampstead Lester Morton Court, LLC; EMP II, Inc.; and Hampstead Partners, Inc. under Maryland negligence law and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, for defendants' alleged refusal to accommodate Hill's physical disability. Pending before this court is defendants' motion to dismiss or, in the alternative, for summary judgment. The motion is fully briefed, and no oral argument is necessary. *See* Local R. 105.6. Defendants' motion is treated as a motion for summary judgment and will be granted.

## BACKGROUND

Plaintiff Gladys Hill is a diabetic amputee who uses a wheelchair for mobility. She has lived in unit 1532 at the Hampstead Lester Morton Court ("Lester Morton Court") housing community since 1974. She currently lives with her adult son, Alonzo Mitchell, and daughter, plaintiff Cynthia Mitchell, who serves as her live-in aide. Lester Morton Court is owned by defendant Hampstead Lester Morton Court Partners, LP, of which defendant Hampstead Lester Morton Court, LLC is the sole general partner. Defendant Hampstead Partners, Inc. is the guarantor of Hampstead Lester Morton Court, LLC. Defendant EMP II, Inc., which does

business as Alpha Property Management, serves as the property manager of Lester Morton Court.

Hill has been living in a four-bedroom townhouse at Lester Morton Court for about thirty-seven years. Since her leg was amputated in 2004, however, her ability to use and enjoy the townhouse has been significantly constrained by her confinement to a wheelchair. Because each of the four bedrooms is located on the second floor of the two-story townhouse, Hill is unable to access the bedrooms and has been sleeping in the first-floor living room. Hill's wheelchair was unable to fit through the threshold of the first-floor powder room, moreover, and Hill therefore had to use makeshift bathroom facilities in the living room.[1] Hill cannot bathe without Mitchell's assistance and relies on Mitchell to help prepare her meals and launder her clothes.

To enter and exit the townhouse, Hill must ascend or descend two steps immediately outside her townhouse and another step that leads to the parking lot. Incapable of navigating the steps on her own, Hill relies on her son and daughter to maneuver the wheelchair over the steps. Hill also is unable to use the electric wheelchair prescribed to her because her children are unable to lift it up and down the stairs. She is consequently limited to using a manual wheelchair, and because of decreased arm strength she is dependent upon her children to push the wheelchair.

In June 2004 Hill's doctor informed Lester Morton Court that Hill's leg had been amputated and that she "will need a [wheelchair] ramp to access her apartment." (ECF No. 1-1.)[2] On December 14, 2004, the community manager at Lester Morton Court assured Hill that

---

[1] After plaintiffs filed this suit, defendants voluntarily agreed to make certain modifications to Hill's first-floor powder room, including the widening of the door jamb.

[2] At some point Hill also requested modifications to the first-floor powder room—including the widening of the bathroom entryway and the installation of grab bars next to the toilet—sufficient to enable Hill to use that bathroom without assistance. It is unclear whether this request was

Alpha Property Management would "make preparations to install the handicap ramp" during a renovation process scheduled to occur at Lester Morton Court in 2005. (Pl.'s Ex. 1, ECF No. 1-2.) Hill was assured that she would receive "a notification letter as to what date the ramp will be installed at [the] entrance to [her] house." (*Id.*) After Hill reiterated her request in January 2005, the community manager explained in a March 2005 letter that "the property is currently undergoing a rehabilitation construction project" that would retrofit certain units to bring them into compliance with section 504 of the Rehabilitation Act and the Americans with Disabilities Act. (Pl.'s Ex. 2, ECF No. 1-4.) "Upon completion of the project," the letter stated, "you would have the opportunity to request a transfer to one of these units to accommodate your needs." (*Id.*)

The Lester Morton Court renovation wrapped up in October 2005, but Alpha Property Management never offered Hill an opportunity to transfer to a three- or four-bedroom apartment. Hill cites their silence as evidence of defendants' refusal to accommodate her disability. But there are, in fact, no three- or four-bedroom wheelchair-accessible apartments at Lester Morton Court.[3] At the preliminary-injunction hearing, moreover, Hill testified that she knew in 2005 that Lester Morton Court was not constructing any three-bedroom wheelchair-accessible apartments during its renovation. She further testified that she knew in 2005 that other properties managed by Alpha Property Management did not have any suitable apartments. She did not investigate or pursue potential opportunities to move to another housing community because she

---

made in 2004 at the time she initially requested the wheelchair ramp. In all events, the record shows that Hill asked for the powder-room modifications no later than June 2006, and as noted, these modifications have been made.

[3] There is some evidence suggesting that Lester Morton Court offered to transfer Hill to a two-bedroom apartment that would accommodate both Hill and Mitchell, her live-in aide. Hill unequivocally stated at the preliminary-injunction hearing, however, that she was never willing to transfer to a two-bedroom wheelchair-accessible apartment. (Hearing Tr. at 65–67.)

"liked living at Lester Morton" and maintained hope that they would provide the requested modifications to her townhouse. (Hearing Tr. at 67-68.)  According to Hill, the wheelchair ramp would have enabled her to attend regular physical therapy sessions at the Johns Hopkins outpatient clinic near her townhouse.  Those sessions, in turn, would prepare her to use a prosthetic leg, allowing her to climb the stairs in her townhouse. (*Id.* at 68.)  Hill therefore focused on obtaining a wheelchair ramp rather than searching for alternative housing.

Hill renewed her request at a July 2006 meeting.  During that meeting, it is undisputed that defendants denied her request for structural modifications, stating that "they had no obligation to provide a reasonable accommodation under Section 504 of the Rehabilitation Act of 1973 because they had created one and two bedroom accessible units on the premises." (Compl. ¶ 33, ECF No. 14; *see also id.* ¶ 34 ("Defendants stated at the July 18, 2006 meeting that it would be too expensive to provide a wheelchair ramp for Mrs. Hill, and that they would not do so because if they did, other tenants might request one as well . . . ."); Pl.'s Opp. at 9.)

During a similar 2008 meeting with the Lester Morton Court property manager, Hill again asked for structural modifications or transfer.  The property manager then provided Hill with an application for Poppleton Place Apartments, another housing community managed by Alpha Property Management.  On August 19, 2008, Hill completed an application for a three-bedroom, wheelchair-accessible apartment at Poppleton Place.[4]  Hill never received any response to her application, but she has testified that she knew when she completed the application that Poppleton Place had no three-bedroom handicap-accessible apartments. (*Id.* at 76-77.)

Plaintiffs' counsel at the Maryland Disability Law Center sent a letter to Alpha Property Management and the property manager at Lester Morton Court on September 30, 2010, renewing

---

[4] Poppleton Place is not owned by defendants. (ECF No. 27 ¶¶ 10-11.)

the request for a wheelchair ramp and bathroom modifications and threatening to pursue legal remedies. The letter attached an architect's estimate of the cost of the structural modifications demanded by plaintiffs. On November 1, 2010, counsel for defendants sent an email to plaintiffs' counsel stating that the requested modifications would constitute an undue financial burden and therefore were not required by law.

Plaintiffs did not file their original complaint in this suit until February 21, 2012.[5] Because Hampstead Lester Morton Court Partners, LP receives an annual tax credit for plaintiffs' townhouse through the Federal Low Income Housing Tax Credit Program, 26 U.S.C. § 26, Lester Morton Court is subject to section 504 of the Rehabilitation Act. Plaintiffs allege that defendants violated section 504 when they refused to install a wheelchair ramp outside Hill's townhouse and failed to act on Hill's request to transfer to a wheelchair-accessible apartment. Plaintiffs further allege that defendants negligently hired, trained, and supervised their employees. Plaintiffs seek declaratory relief, damages, and a permanent injunction compelling defendants to accommodate Hill's disability.[6] Defendants filed the pending motion on July 13, 2012.

**STANDARD**

Defendants have moved to dismiss or, in the alternative, for summary judgment. A motion to dismiss "is intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses." *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). The statute of limitations is an affirmative defense that may be decided on a motion to dismiss only "in the relatively rare circumstances where facts sufficient

---

[5] Plaintiffs filed an amended complaint on April 12, 2012.
[6] Plaintiffs also sought a preliminary injunction. This court held a motion hearing and subsequently denied the motion on June 14, 2012.

to rule on [the] affirmative defense are alleged in the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *see also Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005). Because this court must look to facts outside the complaint to determine the date on which the applicable statute of limitations began to run, defendants' motion will be treated as one for summary judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Conversely, the motion should be denied if "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

## ANALYSIS

Defendants argue that plaintiffs' suit should be dismissed because both claims are barred by the applicable statutes of limitations. Negligence claims in Maryland are subject to a three-year statute of limitations. Md. Code Ann., Cts. & Jud. Proc. § 5-101. Section 504 of the Rehabilitation Act of 1973 does not contain a specific limitations period, and the most appropriate Maryland statute of limitations therefore must be applied to plaintiffs' cause of action. *See McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129 (4th Cir. 1994). In *Schalk v. Associated Anesthesiology Practice*, 316 F. Supp. 2d 244, 251 (D. Md. 2004), this

6

court held that the limitations period for Rehabilitation Act claims in Maryland is three years—a determination that the parties here do not dispute.

The statute of limitations on a Rehabilitation Act claim begins to run "when the plaintiff 'knows or has reason to know of the injury which is the basis of the action.'" *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) (quoting *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)). In a separate but related context concerning the statute of limitations in a civil rights case, the Supreme Court "stressed the need to identify with care the specific [discriminatory] practice that is at issue." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 624 (2007). Section 504 protects certain disabled persons from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The statute does not "necessarily require a recipient [of federal financial assistance] to make each of its existing facilities accessible to and usable by individuals with handicaps." 24 C.F.R. § 8.24(a)(1). It requires that the housing program, "when viewed in its entirety, [be] readily accessible to and usable by individuals with handicaps." *Id.* § 8.24(a). Recipients of federal aid "may comply with the requirements of [the Rehabilitation Act] through such means as reassignment of services to accessible buildings, assignment of aides to beneficiaries, . . . alteration of existing facilities and construction of new facilities." *Id.* § 8.24(b). Thus, the alleged violation in this case was not the existence of steps outside Hill's townhouse; it was defendants' refusal to accommodate Hill's disability by performing the requested structural modifications or transferring her to a three-bedroom wheelchair-accessible apartment.

Plaintiffs' claims therefore are time-barred if they had reason to know before February 21, 2009—three years before filing this suit—that defendants would not accommodate Hill's

request for either structural modifications or transfer to wheelchair-accessible housing. The pleadings, testimony, and document exhibits provide ample undisputed evidence that Hill and Mitchell had reason to know as early as 2006 that their request would be denied. Hill testified that she knew in 2005 and 2006 that neither Lester Morton Court nor the other properties managed by Alpha Property Management had wheelchair-accessible three-bedroom apartments, and plaintiffs therefore had reason to know at that time that their request for a transfer would not be accommodated. Hill never visited other housing communities to search for suitable housing, and she testified that she preferred to stay in her townhouse at Lester Morton Court. Although Hill completed an application for the Poppleton Place Apartments, moreover, Hill testified that she knew Poppleton Place had no three-bedroom accessible apartments, and she was not willing to move into a two-bedroom apartment. Hill made no effort to follow up with anyone at Poppleton Place regarding her application, and drawing all reasonable inferences in her favor, she and Mitchell had no reason to believe in 2006 that a transfer would occur.

     Hill also had reason to know, long before February 2009, that defendants would not accommodate her request for structural modifications. Defendants suggested in their 2004 letter that a wheelchair ramp would be installed in connection with the 2005 renovations. In its March 2005 letter, however, Alpha Property Management made no mention of the wheelchair ramp, instead stating that Hill and Mitchell would be provided an opportunity to transfer into a retrofitted, wheelchair-accessible apartment upon completion of the renovations. Furthermore, and most significantly, when Hill renewed her request for a wheelchair ramp during the 2006 meeting, the request was expressly denied. The undisputed evidence thus clearly indicates that plaintiffs could not reasonably have believed that Lester Morton Court would make the requested modifications.

To avoid this limitations bar, Hill and Mitchell advance two alternative theories. First, plaintiffs argue that their renewed request in 2010, and defendants' subsequent denial of that request, reset the three-year limitations clock. Thus, they contend that the statute of limitations will not expire until November 2013, three years after defendants' counsel denied any duty to complete the requested structural modifications. Second, invoking the continuing-violation doctrine, Hill and Mitchell contend that defendants' continual denials of Hill's requests amount to a pattern of discriminatory conduct that, as a whole, constitutes an actionable, aggregable claim as long as one of those denials occurred within the limitations period. Unfortunately for the plaintiffs, neither contention is supported by Fourth Circuit case law.

"[E]very refusal to reconsider the [decision] does not revive the limitations period for the original . . . decision. To do so would upset the balance struck by the limitations period between the reasonable needs of individual claimants and the public interest in finality." *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 189 (4th Cir. 1999); *see also Del. State Coll. v. Ricks*, 449 U.S. 250, 261 n.15 (1980) ("Mere requests to reconsider . . . cannot extend the limitations period applicable to the civil rights laws."). The property manager informed Hill in 2004 that the wheelchair ramp would be installed the following year, and her 2005 letter thus was not a "request[] to reconsider"; rather, it was an appeal to carry through the promised modifications. In 2006, however, the property manager made clear that Hill's only option was to transfer to a two-bedroom wheelchair-accessible apartment; defendants rejected Hill's request for structural modifications to her townhouse. Hill's subsequent efforts to secure those structural modifications therefore amounted to requests for reconsideration, and the law is clear that such requests neither toll nor restart the limitations clock.

Nor can the continuing-violation doctrine save plaintiffs' claims from the statute of limitations.  "In general, to establish a continuing violation the plaintiff must establish that the unconstitutional or illegal act was a fixed and continuing practice." *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991) (internal modifications and quotation marks omitted).  A continuing violation exists only where the plaintiff can show that the illegal act occurred "in a series of separate acts," where "the same alleged violation was committed at the time of each act." *A Soc'y Without A Name*, 655 F.3d at 348.  The issue here is whether defendants' repeated denials of Hill's request for structural modifications constituted a continuing violation.

The answer appears to be no.  "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Nat'l Adver. Co.*, 947 F.2d at 1166 (internal quotation marks omitted).  Where each act relates to the exact same subject matter—*e.g.*, regularly requesting the *same* structural modifications to Hill's townhouse—an individual cannot "keep his claim . . . forever alive" by periodically renewing the request.  *West v. ITT Cont'l Baking Co.*, 683 F.2d 845, 846 (4th Cir. 1982) ("[A]ll of the wrongs relate solely to that event and [defendant's] refusal to change its decision.").  Plaintiffs merely allege that they renewed their request for accommodations on several occasions and that those requests were regularly denied.  The consistent denial of the same request made by the same individual does not constitute continuing discrimination.  *See A Soc'y Without A Name*, 655 F.3d at 349; *Jersey Heights Neighborhood Ass'n*, 174 F.3d at 189; *Nat'l Adver. Co.*, 947 F.2d at 1167.  The fact that defendants could, at any time, reverse course and accommodate Hill's request by installing a wheelchair ramp does not render their refusal to do so a continuing violation. (*See* Pl.'s Opp. at 9, ECF No. 35 ("Mrs. Hill would naturally have assumed that a new property manager might

10

take a different course of action . . . .")). Such logic would nullify the statute of limitations and subject defendants to the threat of repeated lawsuits for the same allegedly discriminatory decisions.[7]

The alleged violation in this case was defendants' denial of Hill's request for reasonable accommodations. That denial occurred no later than Hill's 2006 meeting with the Lester Morton Court property manager. At that meeting Hill was clearly and unequivocally told that Lester Morton Court would not make the requested structural modifications. (*See* Compl. ¶¶ 33-34; Pl.'s Opp. at 9). That notification constituted the denial which gave rise to Hill's claim, and even if this court draws all reasonable inferences in plaintiffs' favor, as it must, the undisputed evidence indicates the limitation clock began to tick when Lester Morton Court expressly denied Hill's request at the 2006 meeting. Plaintiffs filed this suit more than three years after that meeting, by which time the limitations period had expired.

---

[7] In a January 24, 2013, letter to this court, plaintiffs' counsel cited *Scherr v. Marriott International. Inc.*, No. 11-3833, 2013 WL 57857, at *5 (7th Cir. Jan. 7, 2013), for the broad proposition that the statute of limitations does not bar an otherwise time-barred suit for injunctive relief under the Americans with Disabilities Act ("ADA") as long as the allegedly noncompliant building feature continues to exist and to harm the plaintiff. The Seventh Circuit cited the language of the ADA in support of its conclusion that the limitations period will never expire as long as the injurious condition continues to exist. *Id.* In this case the gravamen of the complaint is the failure to provide a particular accommodation, which was requested and denied. It does not appear that the Seventh Circuit's broad principle has been adopted in the Fourth Circuit, nor that it would necessarily apply to Hill's specific claim. *See A Soc'y Without A Name*, 655 F.3d at 349 (differentiating between continuing violations and continuing effects and holding that continuing effects of an ADA-violative decision neither toll nor restart the limitations clock).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment will be granted and judgment will be entered in favor of defendants. A separate order follows.

March 28, 2013 /s/
Date Catherine C. Blake
United States District Judge